**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12-cr-290-2 |
| v. | ) | |
| | ) | Hon. James B. Zagel |
| MIGUEL LEAL, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO THE**
**GOVERNMENT'S OBJECTIONS TO THE PSR**

Defendant, Mr. Leal Leal, by his attorneys, responds as follows, in parallel format, to the Government's Objections to the PSR:

**I.     INTRODUCTION**

In 2013, the USDA recalled more than 13 million pounds of food because the food contained various adulterants ranging from listeria to undeclared allergens.[1]  Meanwhile, its sister agency, the FDA, initiated recalls on 2,194 food products during the same time period, accounting for various issues with food products, ranging from Listeria, to the presence of metal shavings, to other adulterants.[2]  Food recalls are part of commercial life in the United States.  They are not desirable but they are unavoidable.

This case, as it applies to Miguel Leal, tangentially involves a recall of cincho cheese. Mr. Leal purchased cincho cheese from Hot Peppers, Inc., a company controlled by Jose Zurita, and linked to Zurita's Mexican cheese production operation, for over a year.  The crime that Mr.

---

[1]  *See* USDA Summary of Recall Cases in Calendar Year 2013, available at:  http://www.fsis.usda.gov/wps/portal/fsis/topics/recalls-and-public-health-alerts/recall-summaries (last visited October 15, 2014).

[2]  *See* FDA 2013 Recall Summary, available at:  http://www.accessdata.fda.gov/scripts/enforcement/enforce_rpt-Product-Tabs.cfm?action=Expand+Index&w=01022013&lang=eng#food.

1

Leal committed occurred in April 2007 when Mr. Leal believed he had permission to sell a shipment of the cheese and started to do so, but subsequently learned that the FDA had not yet released it. When contacted by Zurita and told of this administrative hiccup, Mr. Leal agreed to lie to the FDA about the location of the 311 boxes he had already sold if the FDA ever asked about the cheese, and he agreed to take additional steps to "verify" the lie if asked. Mr. Leal was scared that he had done something wrong and thought a simple lie would make it go away. The crime began and ended in April 2007, after which he did not hear again about the FDA or April Shipment for months.

As it turned out, the cheese about which Mr. Leal agreed to lie was "adulterated." Unbeknownst to Mr. Leal, FDA samples from the April Shipment later revealed the presence of adulterants in some of the cheese that he had shipped, and the FDA initiated a recall of that cheese. Rather than seeing the recall for what it is – an undesirable but common phenomenon – the government has conflated the fact of the recall with Mr. Leal's lie and concocted a theory of this case in which Mr. Leal knew that he was selling cheese that was adulterated and subject to recall, and lied to cover up this scheme.

As explained below, this theory is entirely inaccurate, and is premised on the government drawing inferences from inaccurate facts and seeing sinister motives in otherwise innocent conduct. In contrast to the government's view of the case, the plea agreement and the Presentence Report (PSR) both accurately set forth Mr. Leal's discrete conspiracy to lie to the FDA. And following an extensive presentence investigation, the PSR finds a guidelines sentence of 10 to 16 months is applicable, within Zone C of the Guidelines. In reaching this conclusion, the probation officer considered and rejected the majority of the government's sentencing positions, which had advocated for an applicable guideline range of 168 to 210 months'

2

incarceration. The probation officer found the government's efforts to impose certain enhancements to be "unfounded and approaching unjust." PSR, ¶15. Nevertheless, the government, for its part, continues to see this as a grand and wide-sweeping conspiracy.

This is Mr. Leal's first encounter with the criminal justice system. Until his interaction with Probation Officer Sandy DeNicholas, Mr. Leal had experienced a system that lacked any semblance of fairness and justice. Ms. DeNicholas's thoughtful consideration of the facts and the sentencing issues presented were Mr. Leal's first affirmation that our justice system, in fact, seeks just results. And Mr. Leal trusts that this Court will also see through the government's "unfounded and approaching unjust" version of events, and impose on him a just and fair sentence.

## II. RESPONSE TO THE GOVERNMENT'S FACTUAL BACKGROUND

Mr. Leal has set forth in his Sentencing Memorandum the narrative of his offense conduct. He has explained what happened, and why it happened. He will not repeat that narrative here. In its place, Mr. Leal will do two things: (1) highlight three key facts that the government obfuscates in its "factual background,"[3] and (2) undertake to explain why the government's "factual" narrative of his offense conduct does not hold water.

### A. The government obfuscates three key facts

The government's factual background includes pages and pages – indeed, entire sections – devoted to notices sent by the FDA to Jose Zurita, his company HPI, and the importer Camelot,

---

[3] It is procedurally improper for the government to offer as fact his personal view of the case. His musings are not reliable evidence. At this stage of the proceedings, the only facts are those admitted in the plea agreement or found by the PSR. To the extent the government wishes to introduce additional facts, or counter those in the PSR, it must do more. "When a [party] has failed to produce any evidence calling the report's accuracy into question, a district court may rely entirely on the PSR." *United States v. O'Doherty*, 643 F.3d 209, 219 (7th Cir. 2011) (quoting *United States v. Artley,* 489 F.3d 813, 821 (7th Cir.2007))

informing them that the April, May and June Shipments were subject to hold orders and could not be sold, and later that samples taken from them revealed adulterants in the cheese which needed to be destroyed. The government's motive for doing so is clear: to suggest that Mr. Leal was aware of this information and should be held accountable for it. That is simply false.

1. **Mr. Leal Never Received Notice of Any FDA Hold Orders:** Integral to this case is whether Mr. Leal knew that the shipments of cincho cheese he received in April, May and June 2007 were each subject to an FDA hold order. But nowhere in its objections does the government present any concrete evidence that Mr. Leal knew a hold order had been placed on any of the cincho cheese shipments. *See* R. 128, pp. 5 – 7. In fact, he did not. The PSR correctly concludes that there is no evidence Mr. Leal was aware of the existence of a hold order issued by the FDA. *See* PSR, ¶42.

2. **Mr. Leal Never Received Notice of the FDA Testing Results:** From April 2007 through August 2007, the FDA sampled and tested the three shipments that MCP received from HPI. As the FDA conducted its testing, the results slowly trickled out to HPI and Camelot. Again, Mr. Leal was *never made aware of these results.*

3. **Mr. Leal Believed, Based on Representations Made by Jose Zurita, That the Cincho Cheese Had Been Cleared by the FDA Prior to Delivery to MCP:** Throughout Mr. Leal's business dealings with Jose Zurita, Mr. Leal understood that the cheese delivered to MCP had been cleared by the FDA for sale into the United States at the time he sold it. Even as to the 311 boxes about which he agreed to lie, Mr. Leal only found out that the sales should not have occurred *after* the cheese had been sold. Mr. Leal will present evidence of emails wherein Jose Zurita and/or Roberto Garcia discuss the need for the cheese to be cleared by the FDA, or the fact that the FDA and/or U.S. Customs had cleared the cheese.[4]

## B. The Inferences Drawn by the Government Are Simply Wrong

In addition to obfuscating these key facts, the inference of sweeping criminal conduct the government draws from just a small handful of facts is simply wrong. The government's view of this case is that Mr. Leal knowingly and intentionally distributed three shipments of cincho cheese that he knew were adulterated, and that his agreement to lie to the FDA was part of a

---

[4] Despite changing her story across multiple interviews, Cynthia Gutierrez, an apparent government witness, has steadfastly maintained that she believed all the cheese had been released by the FDA before it was sold.

4

grand conspiracy to cover up that the cincho cheese was adulterated. As support for this conspiracy, the government relies almost entirely on four relatively undisputed facts:

1. Mr. Leal visited one of Zurita's factories in Mexico and believed that the working conditions were terrible.

2. Mr. Leal was told on April 19, 2007, that the FDA wanted to check some pallets of cheese and that DQM could not sell the April shipment for now, and he agreed to lie to the FDA about the location of 311 boxes that had already been sold.

3. Later that summer, cheese from April, May and June shipments of cincho cheese was being returned by customers because it contained mold and other physically apparent abnormalities.

4. Mr. Leal attempted to recondition some this cincho cheese through a process called "washing."

Simply put, these facts do no support – and indeed contradict – the government's grand conspiracy theory that Mr. Leal knew he was selling adulterated cheese and lied to the FDA to further this grand conspiracy.

### 1. The factories in Mexico

Mr. Leal's visit to Mexico to view one of Zurita's factories is a sign that Mr. Leal took his job seriously, not evidence that he knew the cheese he was buying was adulterated.

First, Mr. Leal's statement to the government was that the "working conditions" of the one factory he visited in Mexico were terrible – not that Zurita's cheese-making process was terrible. The difference is significant. Dr. Catherine Donnelly, a professor of microbiology, will testify at the sentencing hearing, among other things, that some of the best artisanal cheese in the world is made in damp dark caves without resulting in adulterated product. Furthermore, the evidence shows that Zurita made cheese in multiple factories throughout Mexico. The evidence therefore suggests that the cheese in question came from multiple factories, whose condition is not known.

Second, by latching on to this single phrase, ("terrible working conditions"), the government ignores other contrary evidence. For example, there is evidence that Mr. Leal worked with Zurita to test the cheese he produced and to improve the cheese-making process from the beginning. Among other things, in May 2006, Mr. Leal requested that Zurita run tests on the cheese being made in one of his factories. Zurita did so, and reported to Mr. Leal on May 16, 2006, that the tests revealed he had a problem with "fecal coliforms."[5] Fecal coliforms are non-pathogenic bacteria and do not cause illness but indicate the presence of fecal matter in the milk used to make cheese which can be a precursor to other pathogenic organisms. Zurita then indicated that he was taking steps to prevent any contamination of the product and asked Mr. Leal if he had any other recommendations beyond those steps. See also Mr. Leal's Letter to the Court (attached as Exhibit A to his Sentencing Memorandum).

Third, by April 2007, Mr. Leal had been importing and distributing Zurita's cincho cheese for well over one year. That cheese was sold throughout the country and enjoyed by thousands of people. Nobody got sick from it. Nobody reported any problems of adulteration. To Mr. Leal's knowledge, all of the cheese had been inspected by the FDA and approved for distribution. In fact, people loved it and orders for the cheese only increased. Thus, Mr. Leal had strong evidence and every reason to believe that the cincho cheese Zurita was producing in his factories in Mexico was a high quality, safe product.

## 2. Mr. Leal agrees to lie in April 2007

---

[5] The government asserts that this email, dated May 16, 2006 on its face, was actually sent in 2007. But all credible evidence is to the contrary as the Court will learn at the sentencing hearing. This completely undermines the government's argument that Mr. Leal was told that there was a problem with fecal coliforms and then turned around and ordered the May 2007 Shipment just "four days later." (Mr. Leal will also put on evidence explaining why the translation of this email as "bacteria" instead of "coliforms" is materially inaccurate.)

The fact that Mr. Leal was told the FDA wanted to see the cincho cheese in April 2007, and thereafter agreed to lie to cover up the fact that 311 boxes had already been shipped, is not evidence that he knew it was adulterated.

First, Zurita emailed DQM on April 15, 2007, and told DQM that the FDA had cleared the cincho cheese for distribution in the United States. This was the same process that Zurita had followed for the year prior and on which DQM had been relying without problem. In fact, the only cheese made outside of the United States that MCP or DQM ever sold was this cincho cheese. The business deal made with Zurita and his company, Hot Peppers, Inc. (HPI), was that HPI would be responsible for importing the cheese and clearing customs and any other regulatory requirements because DQM and MCP had no experience with that process at all.

This is significant for a few reasons: (1) it means that at the time the 311 boxes about which Mr. Leal agreed to lie were actually shipped, Mr. Leal had absolutely no basis to know or otherwise believe that he was supposed to hold on to them; and (2) it means that when he was subsequently told the FDA wanted to see the cheese, he understood that this was a decision made after the FDA had already inspected and cleared the cheese when it first crossed the border.

Second, while Mr. Leal was told by Cynthia Gutierrez that they could not sell "for now," he was never sent the actual hold order issued by the FDA. The hold order and all subsequent communications were issued to HPI and the importer Camelot, but not MCP or DQM. In fact, the FDA never spoke directly to Mr. Leal or sent any information or notice to MCP stating that the cheese had to be held. To the contrary, Mr. Leal got word of the FDA's intentions only third-hand, and the information he got was incomplete and inaccurate. Indeed, the very next day, and contrary to what the FDA had said to Zurita and HPI, Zurita told Mr. Leal: the FDA came to see the product, "the product was very good" and Zurita would "take care of the details with the

FDA." Not "hold the cheese," or "wait for the FDA to runs its tests" (despite Zurita being well aware the cheese should be held until released).

Third, in addition to not knowing about the hold order or any other FDA concerns, when Mr. Leal learned in April 2007 that the FDA wanted to see the cheese, he had absolutely no reason to believe there was something wrong with it or that it was adulterated. He had been selling Zurita's cheese for over year without problem and with only increased demand from consumers. Thus, contrary to the government's spin, he had every reason to believe that the cheese was fine and that the FDA inspection was merely an administrative hiccup – not a concern about the safety of the cheese.

### 3. The cheese had problems

The government relies most heavily on the fact that wholesalers and other retailers who bought cincho cheese from the April, May and June Shipments started to return the cheese in the summer of 2007, reporting mold and other physical abnormalities on the cheese. The government infers from this that Mr. Leal knew or should have known that the cheese he was selling was adulterated. This inference is simply wrong.

First, whatever Mr. Leal may have learned about physical problems with the cincho cheese, he learned about them for the first time at the end of June – months after he had agreed to lie to the FDA and well after he had ordered, received and started shipping the cincho cheese at issue in this case. At sentencing Mr. Leal will provide the Court with a timeline of the various emails on which the government relies to show that Mr. Leal should have known there were physical problems with the cheese.

The first email is dated June 4, 2007. It reports only that employees at DQM had notices that some of the cheese was moldy[6] and had small green spots. Notably, the email was sent by Cynthia to Zurita and not copied to Mr. Leal. (Mr. Leal does not work at the DQM facility in Elmhurst. He works at the MCP factory in Darlington, Wisconsin. So the only way for him to know what was seen by workers at the facility in Elmhurst is if someone emails or calls him).

The next emails are from the end of June. They are emails between Mr. Leal and Zurita talking about returned cheese and whether Zurita is going to reimburse Mr. Leal for the returned cheese. They say nothing about mold or other problems – only that the cheese is being returned.

The remaining emails are all dated in late July, August or September. And at this point, the cheese with problems is not being sold to consumers – it is being held and either reconditioned or returned to Zurita. As Mr. Leal states to Zurita on September 4, 2007, "it's been over a month without having cheese that I can sell."

Second, the pathogens and other microbiological findings the FDA discovered are not visible from the outside. You cannot see salmonella when you look at cheese. Nor can you see staphylococcus aureus, or E. coli. And because Mr. Leal never received any of the FDA test results that were sent to Zurita (and kept from Mr. Leal), Mr. Leal had no way to know what the FDA had discovered about the cheese.[7]

---

[6] Mr. Leal will present expert testimony reflecting that the government's translation of the Spanish word "enlamado" as "slimy" is inaccurate. The word means "moldy." Relatedly, the email reports small green specks or freckles, not spots.

[7] Relatedly, the government's factual background in this section is filled with all of the dates of communications sent by the FDA to HPI and Zurita concerning test results and the changed status of the various hold orders. This includes a whole section about efforts by HPI to obstruct and delay orders from the FDA to destroy the April and May Shipments. *See* Gov. Objections, at 17-18. While Mr. Leal has no reason to dispute these facts, nor can the government dispute that Mr. Leal never saw or received or learned about those communications or their contents until the FDA knocked on his door in September 2007 and told him to recall the cheese. Which he did willingly.

Third, conversely, the reported problems of mold and other physical abnormalities do not equate to problems with adulterants in the cheese. Dr. Donnelly will testify that the fact that mold grows on cheese is not an indication that it is adulterated. Indeed, mold growth in some cheeses is a desired characteristic. High quality cheese provides an excellent environment for mold growth. Moreover, other reported observations of the physical characteristics of some of the cincho cheese in this case – such as small green spots, a strong smell, the softness of the surface of the cheese, and deformity of shape – are all defects that arise in the artisanal cheese making process. These defects do not themselves indicate that the cheese was made in unsanitary conditions.

Moreover, the government's assertion that the cheese he was selling was so obviously adulterated due to the "rancid smell, large quantities of mold and fungus, moisture, softness, and slime" (Gov. Objections, at 33) defies logic. Mr. Leal sold primarily to wholesalers and knowledgeable intermediaries who inspected the cheese they bought before accepting it. Why on earth would they buy (or Mr. Leal, a wildly successful cheese producer, believe they would buy) cheese so apparently defective?

In fact, the various problems reported by customers say nothing more than the cincho cheese was bad. Bad in the same way cheddar cheese made by Kraft grows mold if left too long in your refrigerator. Bad in the same way yogurt starts to smell if opened and then left too long before finished. Bad in the same way apples grow soft over time or oranges grow fungus or bananas turn brown and attract fruit flies.

### 4. Mr. Leal attempted to have the cheese washed.

The government's favorite fact is that Mr. Leal asked Zurita and his employees to "wash" some of the cheese that was returned with mold on it. While there is no dispute this occurred,

the government's attempt to paint this as a sinister – let alone criminal – act is astounding. Indeed, the government treats "washing" cheese as if it were "cooking methamphetamine" or "laundering money" – a sinister act that its name alone suggests evil motive.  This is simply not the case.  *See e.g.* "Cheese Washing," by LeAnnaBodyByVi, available at: https://www.youtube.com/watch?v=x5JNTKxKwo4 (last visited 10/16/14).  The fact of the matter is that washing 60 pound wheels of hard cheese to prepare them for sale is part of the artisanal cheese making process.  It is a common, well-accepted practice, and not an indication that someone is trying to cover up the existence of adulterants hidden in the cheese.  (Mr. Leal will supplement You Tube videos with expert testimony on this process as well.)

The government's expert disclosure suggests that their real position is that washing cheese does not remove the microbiological pathogens found in some of the samples taken by the FDA.  On this point, Mr. Leal agrees.  But that fact is irrelevant here, because Mr. Leal did not know that the cheese he was washing contained microbiological pathogens.  He was told by customers and Ms. Gutierrez that the cheese contained mold.  And removing mold and washing cheese are part of the affinage process in artisanal cheese making.

This is not the only instance of the government inferring evil intent from common and respectable business practices.  One other example: the government makes much of the fact that Mr. Leal refused to store Zurita's cheese in his factory.  But again, this is simply good business practice, not evidence of criminal intent.  Dr. Donnelly will testify that no respectable factory (especially one as well run as Mr. Leal's) would allow in its doors cheese made in any other factory because doing so risks cross-contamination.

Indeed, contrary to the government's suggestions, Mr. Leal ran a very clean factory.  Mr. Leal will introduce at sentencing an FDA investigation of his factory conducted in June 2007,

revealing that Mr. Leal went above and beyond the requirements imposed on him by the FDA and that the FDA found no violations or other problems at his factory.

C.  **The inferences the government draws directly contradict the conclusions of the lead investigator in this case**

FDA Special Agent Ronne Malham is the lead investigator on this case.  He was interviewed by USPO Sandra DeNicholas in her efforts to understand the government's evidence and position on this case.  What he told Ms. DeNicholas stands in stark contrast to the arguments advanced by the government and the inferences the governments is asking this Court to draw. He said:

> According to Special Agent Malham, the regulatory branch of the FDA communicates with importers and their brokers--not the distributors--when imported products are subject to hold orders and further investigation. A hold order requires that the product remain at the port of entry and not transported to distributors.
>
> SA Malham affirmed that if an importer or its broker neglect to communicate the FDA's order to the distributor and/or the distributor receives a shipment at its facility--both of which occurred in this case--the distributor would have no reason to suspect FDA involvement, and it would not be improper for them to introduce the product into commerce.
>
> SA Malham stated that *the investigation did not reveal any evidence of any conspiratorial agreements between Defendants Leal and/or Gutierrez with Jose Zurita to obstruct an FDA investigation, other than that related to the 311 missing cartons of cheese in April, or to knowingly distribute adulterated cheese*. The distribution of the cheese throughout the spring and summer of 2007 was done by the defendant prior to learning of the FDA's restrictive orders and of the FDA's findings regarding the presence of harmful pathogens.

PSR, ¶18.

In sum, for more than one year Mr. Leal purchased cincho cheese made by Zurita and sold it in the United States.  His customers loved it and wanted more.  Mr. Leal had no reason to believe that the FDA's request to hold "for now" the cincho cheese in the April Shipment, relayed to him third-hand, had anything to do with adulteration or other health problems with the

cheese. And when, months later, he learned that there were observable physical problems with subsequent shipments of the cheese, he still had no reason to believe the cheese was adulterated. He properly treated it as a quality problem, reconditioning what he could and seeking refunds for the rest. His crime was nothing simply the agreement to lie to the FDA about the location of 311 missing cartons of cincho cheese in April – cheese he had no reason to know was adulterated. While illegal and regrettable, Mr. Leal's crime was not the grand conspiracy to distribute adulterated cheese that the government asserts.

## III. RESPONSE TO THE GOVERNMENT'S "FACTUAL" OBJECTIONS

The government's "factual" objections to the PSR are anything but. Repeatedly, the government states that it objects to the PSR because the USPO infers from an agreed upon fact something different than the government infers. That is, the government does not dispute the facts in the PSR – only the conclusions reached by the USPO based upon those facts. That is argument, not objection. It is improper and not a legitimate basis to object to specific facts in the PSR. *See* Fed. R. Crim. P. 32(f)(1). "To invoke the district court's Rule 32 fact-finding obligation, the [objecting party] is required to make specific allegations of factual inaccuracy. An objection to the ultimate conclusions in the presentence report does not necessarily imply that a 'controverted matter' exists." *United States v. Chee*, 514 F.3d 1106, 1115 (10th Cir. 2008) (internal citations omitted).

To the extent what the government really means is that the PSR fails to include additional facts that the government believes to be important, that is a legitimate objection. *See* Fed. R. Crim. P. 32(f)(1) (allowing for objection to material information omitted from report). But if that is the case, the government is obligated to introduce *evidence* that is, in fact, missing or otherwise omitted. While it may do so at the hearing, it did not do so in its Objections. But bald

statements of the government do not suffice   *See United States v. Mustread*, 42 F.3d 1097, 1102 (7th Cir. 1994) (a party "must produce more than a bare denial, or the judge may rely entirely on the PSR.")

## IV. RESPONSE TO THE GOVERNMENT'S GUIDELINES OBJECTIONS

The PSR properly determined that Mr. Leal's offense level, after acceptance of responsibility, is 12, resulting in an advisory guideline range of 10 to 16 months.  The government disagrees, asserting that the proper offense level is 31, resulting in an advisory guideline range of 108 to 135 months.  Not only is the government wrong, but its aggressive position on some of the guidelines is confounding, given that it has informed defense counsel and this Court that it believes a sentence in the range of 108 months is too high and that it permitted Ms. Gutierrez to enter into an unusual plea agreement in which the government refused to take a position on the applicable guidelines.

Mr. Leal is mindful of the Court's comments to all parties on October 16 that a technically correct Guidelines calculation post-*Booker* is more of a procedural necessity than a substantive one.  Nevertheless, it is imperative to Mr. Leal that this Court appreciates how the government's positions on guidelines reflect a deeper misunderstanding of the facts and law applicable to this case.  And that to the extent the Guidelines have anything to say about Mr. Leal's actual offense conduct, it is that he deserves a sentence closer to a Zone C range of 10 to 16 *months – not* 10 to 16 *years*.

### Count 1

#### A. Loss Amount

The PSR correctly concluded that there was no loss involved in this case.  The government argues that the total value of all three shipments of cheese constitutes a loss that was

reasonably foreseeable to Mr. Leal. The government's theory of loss valuation is wrong on multiple counts.

To establish loss under §2B1.1, the government must present evidence to establish "reasonably foreseeable pecuniary harm" or "intended loss." *Id.*, Note 3(A). And there is no evidence here that anybody actually suffered a loss or that Mr. Leal intended for that to happen. The government is unable to identify one retailer who was either unable to sell the cheese and therefore suffered a loss, or one retailer who was not fully refunded for the cheese that was purchased. PSR, ¶22 (no identifiable victims).

The government's factual support for a loss amount is simply a recitation of the facts that show the cincho cheese had apparent quality issues, causing the cheese to be returned by customers, and had other apparent quality problems such as mold and softness. R. 128, p. 50. But this is not loss. It is commerce. Sometimes cheese, like any other perishable product, is bad and gets returned by buyers for a refund or other credit. That does not make the product a total loss. Here, there is absolutely no evidence that any MCP customer suffered a loss. In fact, the government's own recitation of facts shows that MCP was accepting the cheese back from customers, which necessarily avoided the customers suffering any actual pecuniary loss. *See* R. 128, p. 50.

Even if this Court accepted that Mr. Leal knew the cheese was adulterated when he sold (which he did not), Mr. Leal's ill-gotten gains do not mean the customers suffered a "pecuniary loss." The government's contrary opinion "stem[s] from the faulty supposition that ill-gotten gains must have caused someone a loss, but as [the Seventh Circuit has] stated before, 'intended losses are intended losses, not bookkeeping entries.' It is not enough that a criminal expect a pecuniary gain—he must foresee that his victim will actually suffer pecuniary loss." *United*

15

*States v. Johns,* 686 F.3d 438, 457 (7th Cir. 2012), citing *United States v. Peel*, 595 F.3d 763, 773 (7th Cir.2010).   Here, none of Mr. Leal's customers lost money from the purchase of cincho cheese.

The government fares no better under its "no value" argument, which is both factually and legally flawed.   *See* Gov. Objections, at 53.   As an initial matter, on the facts, the government overstates its evidence.   Two of six samples taken from 3 different shipments contained Salmonella.   This means that four of the six samples did not contain Salmonella.   That is, in each instance where there was a positive Salmonella test result, there was also a negative Salmonella test result.   The government's assertion that the "cheese contained a pathogen, Salmonella, *as well as* extremely high levels of e. Coli and Staphylococcus aureus" simply is not accurate.   *Id.*, at 53.

More importantly, there is absolutely no evidence that Mr. Leal was aware of these test results.   In fact, he was not.   Mr. Leal is only responsible for "reasonably foreseeable pecuniary harm," which requires that the "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."   §2B1.1, Note 3(A)(iv).   The government ignores this requirement and attributes to Mr. Leal information that was unknown to him (as discussed above) in an effort to impermissibly attempt to broaden the scope of reasonable foreseeability.   Simply put, even if the microbiological adulterants found in some of the cheese made it valueless, the fact that Mr. Leal did not know they were there means any lost value was not intended or reasonably foreseeable to him.   *See United States v. Domnenko*, 763 F.3d 768, 770 (7th Cir. 2014) (remanding case for sentencing loss determination because "involve[ment] in a fraudulent scheme does not necessarily mean it was reasonably foreseeable that all the subsequent economic damages would occur, especially when there was

no evidence that" defendants knew all the relevant circumstances surrounding the illegal conduct).

Relatedly, the government recites a series of obvious external quality issues the government alleges existed at the time of the cheese sales to suggest Mr. Leal should have known it was internally adulterated. Gov. Objections, at 50. From a simple common sense standpoint, the government's argument fails the straight-face test. If the cheese "had large amounts of mold and fungus, had a putrid smell and taste, was soft, deformed, and had slimy formations," it defies common sense that any retailer or consumer would purchase the cheese. Moreover, there is absolutely no evidence that any retailer or consumer ever received cheese from MCP that had all of these apparent defects. It simply cannot be true that the cheese was so apparently adulterated on the outside that Mr. Leal should have been aware of its microbiological adulterated state, but that his sophisticated customers would have nonetheless accepted and paid for the cheese (or Mr. Leal would even have believed or foreseen that they would).

Beyond these deficiencies, the government's "no value" approach is not supported by its cited legal authority. The government relies in part on *United States v. Gonzalez-Alvarez*, 277 F.3d 73 (1st Cir. 2002) to support its position. *Gonzalelz-Alvarez* is inapposite to the instant case because the defendant, Gonzalez-Alvarez, was engaged in and intimately aware of the adulteration involved in the product at hand (Grade A milk). Thus, the loss to consumers was reasonably foreseeable to that defendant. Here, there is no evidence that Mr. Leal knew the cheese to be adulterated. To the contrary, he knew that some of the cincho cheese had quality issues, but he believed that the cheese had been cleared by the FDA for sale to the public; was not subject to a hold order; and was being readily purchased by some of his customers. Thus, Mr. Leal did not have reason to believe that the cheese he sold to his customers had "no value."

The government also relies on *United States v. Bhutani*, 266 F.3d 661 (7th Cir. 2001) ("*Bhutani II*"). *Bhutani* similarly fails to help the government's case. First, in *Bhutani*, the defendant was aware of the adulterated nature of the drugs being sold. *See United States v. Bhutani*, 175 F.3d 572, 574 (7th Cir. 1999) ("*Bhutani I*") (adulteration of drug occurred at the direction of the defendant). Second, the rationale for the Court's holding was that the adulterated prescription drug denied the consumers the "benefit of their bargain" "because consumers bought drugs under the false belief that they were in full compliance with the law." *Bhutani II*¸ 266 F.3d at 669. In contrast, Mr. Leal sold the cheese reasonably believing it had been cleared by the FDA for sale in the United States. Additionally, unlike prescription drugs sold in the United States, beyond the border inspections, the FDA has no authority to approve imported cheese for sale in the United States. PSR, ¶35. That is, imported cheese is not marketed nor reasonably understood to be "FDA Approved." Thus, the *Bhutani* "benefit of the bargain" loss calculation is not facially applicable.

Finally, the government's reliance on *United States v. Vitek Supply Corp.*, 144 F.3d 476 (7th Cir. 1998) is not only misplaced, but demonstrates a fundamental misunderstanding by the government of its own case. In *Vitek*, the Seventh Circuit found no loss to Vitek's customers based, in part, on the fact that both the defendant seller and some of the customers who purchased the defendant's livestock feed were aware that the product had not been FDA approved. According to the government, that fact distinguishes *Vitek* from the instant case because "Leal's customers did *not* know that the cheese they purchased contained Salmonella and extremely high levels of E. coli and Staphylococcus aureus, nor were they aware that the cheese could not be lawfully resold in the United States." Gov. Objections, at 56. What the government fails to acknowledge in its argument, however, is that the following is similarly true

and *also* distinguishable from *Vitek*: "Leal~~'s~~ ~~customers~~ did *not* know that the cheese ~~they~~ purchased contained Salmonella and extremely high levels of E. coli and Staphylococcus aureus, nor ~~were they~~ [was he] aware that the cheese could not be lawfully resold in the United States." Absent Mr. Leal knowing this, *Vitek* does not support the government's position.

Moreover, *Vitek* explained that it is difficult to predict consumers' willingness to purchase goods that may have adverse health effects, and in such cases, concluding that all the goods sold were valueless is improper. *Vitek*, 144 F.3d at 491. The exact same conclusion is true here. As the Court will hear at the sentencing hearing through a professor of microbiology and expert in artisanal cheese production, consumers' tastes and demands for artisanal cheese is quite different from the standards that the FDA imposes on large-scale domestic cheese makers. Thus, the government's presumption that the cincho cheese sold by MCP was of no value is not a sound a proposition considering the market demand for this artisanal cheese.

Finally, with respect to loss, the government objects to the PSR's recognition that many of MCP's customers received refunds for the cheese, and to the extent there is any loss it should be reduced by the refunds to customers. PSR, ¶34. According to the government, those returns do not count because they were made after the offense was detected. Gov. Objections, at 57. But that grossly distorts and exaggerates the offense, and what Mr. Leal's "victims" knew. As Agent Malhalm has made clear, there was no conspiracy to sell adulterated cheese. There was only a conspiracy to hide the location of the 311 boxes. Neither Mr. Leal nor any of customers knew that the cheese they were returning was adulterated until the recall happened in September. The government's assertion to the contrary, that the "victims" were aware of the criminal conduct because the cheese Mr. Leal delivered was moldy or otherwise of bad quality, ignores the reality that this exchange occurs routinely in the cheese industry (see Letter from Phil

Calhoun, Exhibit E to the Mr. Leal's Sentencing Memorandum) and that Mr. Leal issued his refunds before he knew the cheese was adulterated.[8]

### B. Victims

The PSR correctly finds that this offense involved no victims. The government objects to this finding, arguing that "92 victims suffered an actual loss." Gov. Objections, at 59. As previously noted, "actual loss" means a "pecuniary harm, which means harm that is monetary or that otherwise is readily measurable in money." §2B1.1, Note 3(A)(iii). Here, there is no evidence that any person who purchased cincho cheese from Mr. Leal suffered an actual pecuniary loss. The government acknowledges that many of Mr. Leal's customers sold the cheese that they received from MCP to their consumers without incident. The rest either rejected the cincho cheese or returned it for a refund. Thus, MCP's customers cannot be considered victims under the Guidelines.

Moreover, the Guidelines make clear that there must be an "actual loss" for a victim to be identified. *See* USSG §2B2.1, Note 1 (defining victim as "any person who sustained any part of the *actual* loss determined under subsection (b)(1)") (emphasis added). "In cases involving the general definition of victim, not only must an individual sustain *actual loss* (i.e., reasonably foreseeable pecuniary harm) in order to be considered a victim, but that loss must also have been included in the court's loss calculation under the guidelines." (Emphasis added.) "Victim Primer (§2B1.1(b)(2)," prepared by Office of General Counsel, U.S. Sentencing Commission (March 2013), available at: http://www.ussc.gov/sites/default/files/pdf/training/primers/Primer_Victims.pdf (last viewed

---

[8] Moreover, as explained below, the PSR found there are no victims. PSR, ¶22. Thus, the government's argument that victims detected the criminal conduct is unsupported at an even more fundamental level than the timing of any discovery. *See Johns,* 686 F.3d at 460 (discussing the need that a "victim" suffer an actual loss for vulnerable victim enhancement to apply).

7/8/14). Consequently, even if the Court were to accept the government's view that the *intended* loss were the entire value of the cincho cheese delivered, a victim only exists if the individual suffered an *actual* loss. *See United States v. Kimoto*, 588 F.3d 464, 496 (7th Cir. 2009) ("whereas the loss calculation can be based on either *actual or intended* loss, the estimation of the number of victims is limited to those who incurred part of the *actual loss*") (emphasis added).

### C. Violation of an Administrative Order

The PSR correctly finds that no enhancement under §2B1.1(b)(9)(C) for violation of an administrative order should be applied. The government's argument is unavailing. From a factual standpoint, the government glosses over the fact that Mr. Leal never knew a hold order was placed on any of the shipments of cheese involved. While Mr. Leal has readily admitted he learned (after the fact) that the first 311 boxes in the April Shipment should not have been sold when Ms. Guttierez relayed to him that it had not been cleared by the FDA, there is no concrete evidence to suggest that Mr. Leal was ever aware that a hold order had been issued.

The government writes: "Leal then directed his employee, Gutierrez, to create a false bill of lading to cover up the fact that he had sold the cheese in violation of the FDA's order." Not so. There is no factual support for the assertion that Mr. Leal believed the false bill of lading was being used to " cover up the fact that he had sold the cheese in violation of the FDA's order." To the contrary, as the PSR correctly found, it is undisputed that the April 2007 hold order was never sent to Mr. Leal and no communication came to him from the FDA or otherwise stating that a hold order had been issued for the entire April Shipment. PSR, ¶42; see also PSR, ¶18 (statement of SA Malhalm).

The government relies on *United States v. Mantas*, 274 F.3d 1127 (7th Cir. 2001). *Mantas* is inapplicable because in *Mantas*, unlike here, the defendant received notice of the

administrative order.  Mr. Leal had *no* contact with the FDA until September 2007, well after the administrative hold orders had been issued, and well after the cheese had been sold.  As the Seventh Circuit suggested in *Mantas*, an essential consideration for application of this enhancement is whether the defendant received notice of the official order because a knowing violation of the order demonstrates "substantial evidence of [the defendant's] aggravated criminal intent."  *Id.*, at 1132.  The government cites to no authority for the proposition that "meaningful interaction" with a co-conspirator (who was actively hiding that interaction from Mr. Leal) is a sufficient basis to impose this enhancement, or that interaction with a co-conspirator is suggestive of another defendant's "aggravated criminal intent."

### D.  Substantial Portion of the Fraud Occurred Outside the United States

The PSR correctly determined that a substantial portion of the conduct did not occur outside the United States.  USSG §2B.1(b)(10)(B) requires that "a *substantial part* of a fraudulent *scheme* was committed from outside the United States."  (Emphasis added.) Here, while it is true that the cincho cheese was made in Mexico, the "fraudulent scheme" described by the government does not involve making the cheese.  Rather, it involves the steps taken to deceive the FDA about where that cheese was in the stream of commerce.  *All* of that conduct occurred in the United States.

The government's argument to the contrary applies this enhancement as if it read – "a condition precedent to the fraudulent scheme occurred outside of the United States" – but the enhancement requires "a substantial part of [the] fraudulent scheme" to occur outside the United States.  Cases that have applied this Guideline illustrate what courts consider to be a "substantial part" of the fraud.  *Compare United States v. Anderson*, 580 F.3d 639 (7th Cir. 2009) (enhancement appropriately applied where conduct involved up to 250 telemarketers making up

to 10,000 calls per week from Canada to further fraud); *United States v. Arnaout*, 431 F.3d 994 (7th Cir. 2005) (enhancement appropriately applied where fraud occurred in Chechnya when donated funds intended for humanitarian purposes were directed to support Chechen soldiers). These cases do not support the government's aggressive application of the Guidelines.[9]

### E. Sophisticated Means Enhancement

The PSR correctly concluded that the sophisticated means enhancement is not applicable. This enhancement should be applied when "especially complex or especially intricate offense conduct pertaining to the execution or concealment of [the] offense" is done. *See* USSG §2B1.1, Note 9(B). The government identifies only the creation of a false bill of lading and boxes of cheese. But this type of conduct is not a basis to apply the sophisticated means enhancement. *See United States v. Baxter*, 2006 WL 1155872 (N.D. Ill. 2006) (creation of one false document related to an IRS audit does not constitute sophisticated means). As SA Malhalm reported to the USPO, a bill of lading is a "standard form" that was altered in this case with correction fluid. PSR, ¶10. Again, Mr. Leal does not contest that his agreement to deceive the FDA through these artifices constitutes criminal conduct. But, Mr. Leal does not agree that this simple, unfortunately conceived fraudulent conduct comes near the threshold of being "especially complex or especially intricate." The PSR correctly concludes that this enhancement should be not be applied.

### F. Enhancement for the Defendant's Role in the Offense

The PSR correctly concludes that no enhancement should be applied under §3B1.1(b). The government disagrees, arguing that "Leal supervised Gutierrez's role in the criminal

---

[9] The fact that Zurita made some phone calls and sent some emails from Mexico directing Ms. Gutierrez and others as to how to handle the FDA does not suffice either. The false statements made to the FDA, and the falsified bill of lading, took place in Elmhurst. And distribution of the 311 boxes for which the lie was meant to cover all took place in the United States.

activity." R. 128, p. 64. From a factual standpoint, there is myriad evidence that Gutierrez's purported criminal activity was directed by Jose Zurita. Just as an example of this issue, SA Malhalm, under oath in April 2012 (almost 5 years into the FDA investigation of this case), stated that "Gutierrez said *that Jose Zurita told her to change information on the bill of lading* and provide it to the FDA inspector who was asking for the whereabouts of the shipment." *See* Search Warrant, 12M212, at 28 (emphasis added). SA Malham further affirmed under oath that "Gutierrez said that Jose Zurita told her not to worry, that there was nothing wrong with changing the information on the bill of lading, and that he had already told her that the cheese had been released by the FDA." *Id.* And, he stated under oath that according to Cynthia Gutierrez when cheese was returned by dissatisfied customers, "Jose Zurita and Baldemar Zurita told Gutierrez they could 'wash' the cheese." *Id.,* p. 29. This information was corroborated by Baldemar Zurita, who told the government that when he and Ms. Gutierrez met with the FDA in April 2007 and she needed information to support the lie, Ms. Gutierrez called Jose Zurita on the telephone – not Mr. Leal.[10]

All of these facts, which were adopted as true by the case agent after five years of investigation, contradict the government's current assertions that:

> Leal told Gutierrez to lie to investigators and to create a false bill of lading. Leal also directed her to work with Tony Zurita and Flavio Maldonado to ensure that returned cheese was "washed" for redistribution to his customers.

---

[10] Mr. Leal is prepared to make available Baldemar "Tony" Zurita's proffer statement sould the Court wish to see it, He will not be called as a witness at the sentencing hearing because his change of plea has been reset to January 2015.

Gov. Objections, at 65. They also contradict the government's argument that "Gutierrez would not have lied to a FDA investigator or created a false bill of lading at the behest of a foreign vendor." *Id.*[11]

In addition to these factual issues, the government's position suffers from legal deficiencies. The government argues that the offense involved "at least five participants in this offense," and proceeds to identify Flavio Maldonado as a fifth participant. Yet a "participant," by definition, "is a person who is criminally responsible for the commission of the offense." §3C1.1, Note 1. *See, e.g., United States v. Causey*, 748 F.3d 310, 322 (7th Cir. 2014) (§3C1.1 enhancement properly applied in mortgage fraud case because an uncharged participant knowingly engaged in fraud by signing false HUD-1 application). The government's sole basis for concluding that Maldonado is a "participant" (as that term is used by the Guidelines) is that he assisted in the washing of cheese. As Mr. Leal will demonstrate at the sentencing hearing, "washing" of cheese is part of "affinage," which is the process of artisanal cheese making that creates a hard finish to cheese.

Alternatively, the government argues that the criminal conduct was "otherwise extensive." The government's error in this approach is that the criminal activity to which Mr. Leal pled was not "otherwise extensive." He agreed to lie to the FDA about the location of 311 boxes of cincho cheese. The government presumes a larger conspiracy exists. As the case agent stated to the probation officer, there was no evidence of a larger conspiracy beyond the agreement to lie regarding the location of the 311 boxes of cincho cheese. PSR, ¶18. *Compare*

---

[11] On October 16, Ms. Gutierrez entered into a plea agreement with a factual basis that flatly contradicts in material ways what she previously told the government, and what the government in turn reported as true, under oath. She will apparently be called to testify for the government at Mr. Leal's sentencing and will testify to her new version of events. As will become clear, her change in story comes only after Mr. Leal pled guilty and after she had been promised substantial benefits for her cooperation, and it should not be credited.

*United States v. Figueroa*, 682 F.3d 694 (7th Cir. 2012) (noting that otherwise extensive can include geographic scope or purposeful inclusion of non-participants in the criminal conduct). The PSR correctly concluded that there is no basis to enhance Mr. Leal's offense conduct based on his role in the offense.

### G. Acceptance of Responsibility

The PSR correctly concludes that Mr. Leal is entitled to a Guideline reduction based on acceptance of responsibility. The government, in arguing against acceptance, ignores that Mr. Leal is the first defendant to plead guilty, well in advance of trial; Mr. Leal provided three statements to government agents without having counsel present and two additional statements to the government pursuant to proffer protection (each of these sessions produced multiple-page reports); and that he offered and took significant steps to assist the government in its investigation. *See* Mr. Leal's Sentencing Memo. Even after his guilty plea, Mr. Leal has offered to assist the government in its efforts to locate Jose Zurita.

Against this ignored backdrop, the government argues that Mr. Leal obstructed justice after the commission of the instant offense and therefore does not deserve acceptance. Gov. Objections, at 66. The government identifies three statements as obstructive. We address them in turn.

1. "Mr. Leal denied ever working to secure FDA release of imported cheese that he purchased from HPI." *Id.* The government does not identify any piece of evidence, circumstantial or otherwise, that Mr. Leal ever worked to secure the FDA release of imported cheese. Mr. Leal's statement to the government on this point was true at the time made, and remains true today.

2. "On May 19, 2009, agents confronted Leal with emails regarding the false bill of lading that was created to trick the FDA investigator into believing that the 311 cartons of cheese were located in MCP's Darlington plant. After the agents confronted Leal with the emails, Leal said that 'the cheese was probably shipped to Darlington, probably to be shipped to another plant,' even though Leal admitted in subsequent interviews that he knew that the cheese was not in the Darlington plant

26

but had, in fact, been sold to customers. . . . *It wasn't until Leal's third interview with agents, on June 23, 2009, that he admitted that MCP never put any HPI cheese in the Darlington plant."*  R. 128, p. 66 (emphasis added).  In fact, the report prepared by the interviewing agent read:

> "Leal initially stated the cheese was 'probably shipped to Darlington, probably to be shipped to another plant.'  Leal then stated it was not stored in Darlington, as he 'did not want it in the plant.'  Leal then stated Zurita, at one point stated FDA requested if [MCP] could store some cheese, and Leal told him no."

Leal's honest admissions in the May 2009 interview that "[the cheese] was not stored in Darlington," and that Leal had told Zurita that MCP would not store cheese for him, *were admissions* that the cheese was never stored in MCP's Darlington plant. As SA Malham stated to the USPO, "Leal participated in multiple investigative interviews, through which he was cooperative.  Although the defendant was not entirely forthcoming during the first interview with authorities . . .the defendant was forthcoming in subsequent interviews." PSR, ¶21.  The government's position to the contrary is completely unsubstantiated.

3. Finally, the government argues that Mr. Leal's failure to disclose (not denial of) the "washing" of cheese in an early interview is another basis for denying acceptance of responsibility.  R. 128, p. 66.  The government does not suggest that agents had asked Mr. Leal about "washing" cheese, so it is unclear how Mr. Leal's failure to tell agents everything about the instant conduct can be a basis for denying acceptance of responsibility.

Perhaps more disturbing is that the government had acknowledged that Mr. Leal was entitled to acceptance of responsibility under an earlier plea agreement offered to Mr. Leal – an agreement that also included an agreement for a recommendation of 66% of the low end of the applicable guideline range, and Mr. Leal's ability to argue for any appropriate sentence.  None of the conduct to which the government now points occurred after that offer was made, meaning there is no basis for the government's about face.

Equally as disturbing is the unwarranted difference in the government's treatment of Mr. Leal compared to Ms. Gutierrez.  The government intimates that Mr. Leal's aggressive attack of the government's sentencing approach calls into question his acceptance of responsibility.  *See* PSR, ¶67.  Yet, as this Court knows, the government entered into a plea agreement with Ms.

Gutierrez that does not require her to accept the government's guidelines approach, *yet still offers her the ability to gain acceptance of responsibility.* Apparently offended by Mr. Leal's counsels' decision to question the government's view of the Guidelines, the government has effectively punished Mr. Leal by, *inter alia*, arguing that he is not entitled to acceptance of responsibility despite pleading guilty to three counts; being the first defendant to plead guilty; presenting himself for multiple, protracted interviews (three of which were not proffer protected); voluntarily providing emails to the government that served to further its investigation; voluntarily producing his laptop for government examination; and, offering to assist the government in locating Jose Zurita, and stemming the continuing flow of cheese into the United States.

The PSR correctly determined that Mr. Leal is entitled to acceptance of responsibility. The government's objection should be overruled. The government's position is completely unjustified and demonstrates the lack of fairness with which Mr. Leal has been treated by the government.

## Count Five

### A. Substantial Interference

The PSR correctly concludes that Mr. Leal's conduct did not result in a substantial interference with the administration of justice, and therefore, §2J1.2(b)(2) is not applicable. The government disagrees, arguing that Mr. Leal's conduct resulted in the government expending "significant resources" to investigate the case. R. 128, p. 69. But the government's relies on misstatement of facts, and ignores the lead case agent's candid – and contrary – acknowledgement that Mr. Leal's conduct did *not* result in a substantial expenditure of government resources. PSR, ¶51.

28

As an initial matter, the government falsely states "*Leal and his co-conspirators* lied to the FDA investigators on April 20, 2007, claiming that 311 cartons of cheese that Leal had previously sold were in MCP's Darlington plant." Gov. Objections, at 68. As the government well knows, Mr. Leal did not speak with the FDA regarding these issues until September 2007. Second, in defending assertions that the "FDA expended significant resources," the government falsely states that the FDA made "many fruitless attempts to communicate with HPI *and MCP*." *Id.*, at 60 (emphasis added). As the government well knows, there is no evidence or information (reliable or otherwise) that the FDA attempted to contact MCP to discuss the cincho cheese issue (other than Ms. Gutierrez's encounter with the FDA inspector on April 20, 2007 – which was not "fruitless"). Moreover, as the PSR correctly notes, the government identifies a litany of events that other individuals did that may have caused delay, but Mr. Leal had no control over their conduct. PSR, ¶16. Nor did he even know about it.

Finally, from a legal standpoint, all of the "substantial resources" identified by the government are typical costs associated with conducting a criminal investigation (PSR, ¶51), and, from a legal standpoint, are generally not considered an appropriate basis for applying this enhancement. *See United States v. Johnson*, 485 F.3d 1264, 1271-72 (11th Cir.2007) (noting that upward adjustment could not be based on "expenses associated with prosecuting [the] underlying perjury offense"); *United States v. Norris*, 217 F.3d 262, 273 (5th Cir.2000) (concluding that "expenses incurred with the investigation and prosecution" of defendant's perjury offense may not be considered, "[o]therwise, every perjury conviction would carry this enhancement"); *United States v. Sinclair*, 109 F.3d 1527, 1539 (10th Cir.1997); *United States v.*

*Duran*, 41 F.3d 540, 546 (9th Cir.1994); *United States v. Jones*, 900 F.2d 512, 522 (2d Cir.1990).[12]

### B. Enhancement for Altering an Essential or Especially Probative Document

The PSR correctly concludes that no enhancement should be applied for the "selection of an essential or especially probative record, document, or tangible object." §2J1.2(b)(3). Focusing on the bill of lading, the government unpersuasively disagrees with the PSR's correct conclusion. The government cites to Mr. Leal's plea agreement as support for its position that Mr. Leal was engaged in a wide-spread scheme, and the bill of lading was "especially probative" as it obstructed the FDA from finding the location of known adulterated cheese. R. 128, p. 70. As the government well knows, however, Mr. Leal did *not* plead to a wide-ranging scheme to sell adulterated cheese. He pled to a simple conspiracy to lie to the FDA. Additionally, the government again misstates facts when it alleges: "[b]ecause Leal and his co-conspirators lied to the investigator . . .." As has been made readily apparent, Mr. Leal never communicated with the FDA inspectors in April 2007, and therefore, could not have lied to the investigator.

The background note to §2J1.2 states that "[t]he specific offense characteristics [including this enhancement] reflect the more serious forms of obstruction." The undersigned has identified three cases where this enhancement has even been discussed by an appellate court. None is helpful in discerning when this enhancement is appropriately applied. However, a one-page standard business document that can be prepared and executed by a low level clerk clearly cannot be the type of "essential" and "especially probative" record to which this Guideline is intended to apply. *Cf. Baxter*, 2006 WL 1155872 (creation of one false document related to an IRS audit does not constitute sophisticated means). As is apparent, Mr. Leal made a horribly

---

[12] Mr. Leal notes that this position is contrary to a Seventh Circuit holding on this issue as applied in a different factual setting. *United States v. Hayes*, 358 Fed.Appx. 685 (7th Cir. 2009).

misdirected decision as to how to handle an FDA inquiry. Rather, than addressing this issue directly, Mr. Leal agreed to deceive the FDA if they sought inspection of the cheese at the Monroe, WI facility. While illegal, this is not the "more serious forms of obstruction" to which this enhancement is intended to apply.

## V.    CONCLUSION

Not a single person was injured or otherwise harmed as a result of the conduct in this case. Not a single wholesaler, store owner, or consumer lost money as a result of the conduct in this case. Indeed, tens of thousands of pounds of cincho cheese were sold through retailers to customers in the United States, and thousands of people ate it and enjoyed it – including the three shipments of "adulterated" cheese at issue here.

This is not a case of an avaricious cheese producer knowingly selling adulterated cheese to line his own pockets. Instead, this is a case of the government misconstruing certain undisputed facts and seeing a malicious grand conspiracy where none exists. Fortunately, the PSR properly assessed the evidence and facts presented and reached the correct conclusion – that an advisory guideline range somewhere around 10 to 16 months is the appropriate place to begin when imposing a sentence on Mr. Leal.

For all the reasons noted above, and set forth in Mr. Leal's sentencing memorandum, Mr. Leal respectfully requests this Court to categorically reject the government's objections to the PSR, and for this Court to accept the PSR's factual findings and sentencing conclusions.

Respectfully submitted,

MIGUEL LEAL

By: s/ M. David Weisman
One of his attorneys

M. David Weisman
ARDC #6230714
Miller Shakman & Beem LLP
180 N. LaSalle St., Suite 3600
Chicago, IL 60601
Telephone: (312) 263-3700
Fax: (312) 263-3270
dweisman@millershakman.com